## UNITED STATES DISCTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------- x
LAURENCE   PASKOWITZ,   individually   )
and on behalf of all others similarly situated,  )
                                                 )
                            Plaintiff,           )
                                                 )
            – v. –                               )
                                                 )
ASPEN TECHNOLOGY, INC., CHARLES                  )
KANE, AND MARK E. FUSCO,                         )
                            Defendants.          )
                                                 )
                                                 )
------------------------------------------------------- x
```

C. A. No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation made by and through his attorneys, which investigation included, among other things, a review of the public documents, Securities and Exchange Commission ("SEC") filings, analyst reports, news releases and media reports of Aspen Technology Inc.. ("Aspen" or the "Company"), as follows:

### JURISDICTION AND VENUE

1.      The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

2.      The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331 (federal question jurisdiction).

3.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of materially false and misleading information, occurred in this judicial district. At the time of the wrongs complained of herein, Aspen maintained its executive offices at Ten Canal Park, Cambridge, MA 02141.

4.      In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## THE PARTIES

5.      Plaintiff Laurence D. Paskowitz purchased shares of Aspen common stock during the Class Period, as set forth in the accompanying Certification, and has been damaged as a result of defendants' conduct as alleged herein.

6.      Defendant Aspen provides software and professional services that enable process companies to model, manage, and control their operations. Its integrated aspenONE solutions are aligned with primary industry business processes, providing manufacturers the capability to optimize operational performance, make real-time decisions, and synchronize the plant and supply chain. The company offers Aspen HYSYS and Aspen Plus for process simulation and optimization; Aspen DMCplus for advanced process control; Aspen PIMS for advanced planning and scheduling; and Aspen InfoPlus.21 for plant information management. AspenTech supplies its integrated software and services to companies in the oil and gas, petroleum, chemicals, pharmaceuticals, and other industries that manufacture and produce products from a chemical process. It has strategic alliances with Accenture, Intergraph, Microsoft, and Schlumberger. The company's software solutions are installed at the facilities of approximately 1,500 customers

worldwide. AspenTech was founded by Lawrence B. Evans in 1981 and is headquartered in Cambridge, Massachusetts. Aspen common stock trades on the NASDAQ under the symbol "AZPN".

7.     Defendant Charles Kane has been Senior Vice President & CFO since July 2003. Defendant Kane signed the certifications for the 2003, Form 10-K, 2004 Form 10-K and the 2005 Form 10-K.  On May 18, 2006, Kane submitted his written resignation, effective as of such date.

8.     Defendant Mark E. Fusco has served as President and Chief Executive Officer since January 2005 and a director since December 2003. From December 2003 to January 2005, Fusco served as one of the directors designated by the Series D-1 holders. Defendant Fusco signed the certification for the 2005 Form 10-K.

9.     Defendants Kane and Fusco are collectively referred to as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

10.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Aspen common stock during the period February 6, 2006 to September 6, 2006, inclusive (the "Class Period") and who were damaged thereby (the "Class").  Excluded from the Class are the Company, its officers and directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which the Company has a controlling interest or of which the Company is a parent or subsidiary.

11.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impractical.  At the close of business on October 10, 2005,

43,712,609 shares of common stock, 300,300 shares of Series D-1 convertible preferred stock and 63,064 shares of Series D-2 convertible preferred stock were outstanding. While the exact number of Class members is unknown to the plaintiff at this time, and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, over one thousand members of the Class who held Company stock.

12.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether defendants engaged in acts or conduct in violation of the federal securities laws as alleged herein;

(b)     Whether defendants had a duty to disclose certain information;

(c)     Whether defendants acted negligently, knowingly or recklessly in making materially false and misleading statements or in failing to correct such statements upon learning that they were materially false and misleading during the Class Period;

(d)     Whether the market price of the Company's common stock during the Class Period was artificially inflated because of defendants' conduct complained of herein; and

(e)     Whether members of the Class have sustained damages and, if so, the proper measure of damages.

13.     Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

14.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

15.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impractical. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**Fraud on the Market Presumption**

16.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts regarding Aspen's financial situation during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the securities of the Company traded at all relevant times on the NASDAQ, an efficient and open market;

(d)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and the members of the Class, without knowledge of the misrepresented facts, purchased their Aspen securities between the time defendants failed to disclose and/or misrepresented material facts and the time the truth was disclosed.

17.     Based upon the foregoing, plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market

**The Safe Harbor Provision is Inapplicable**

18.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, there were no statements made with respect to any of those representations forming the basis of the complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aspen who knew that those statements were false when made.

## SUBSTANTIVE ALLEGATIONS

19.     A stock option granted to an employee of a corporation allows the employee to purchase company stock at a specified price – referred to as the "exercise price" – for a specified period of time.  Stock options are granted as part of employee compensations packages as a means to create incentives to boost profitability and stock value.  When the employee exercises

the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised. If the exercise price is lower than it should be, the employee pays less and the company gets less when the stock option is exercised. When shares rise above that price, the holder can profit by buying shares at the lower exercise price and selling them at the higher market price, profiting from the difference, less transaction costs and taxes.

20.     The practice of manipulating stock options dates not only potentially line the pockets of Individual Defendants but also resulted in the overstatement of Aspen's profits between 2002 and the first three quarter of 2006. This is because options priced below the stock fair market value when they are awarded bring the recipient an instant paper gain. Under accounting rules, that is the equivalent of additional compensation and thus must be treated as a cost to the company. Aspen did not properly account for the options granted. As a result of the Company manipulating the actual dates of measurement for stock options Aspen was forced to report on September 6, 2006 that "errors" were made in the accounting for certain historical stock options granted during and prior to fiscal 2004, and previously issued financial statements will require restatement as a result of these errors. Accordingly, previously issued financial statements and the related reports of our independent registered public accounting firm should not be relied upon. The Company stated that it currently estimates that additional compensation and related payroll tax expense of approximately $12 million, $10 million, $7 million, $1 million and $1 million will be required to be recorded in fiscal years 2002, 2003, 2004, 2005 and the first three quarters of fiscal 2006, respectively. In addition, the Company stated that it currently estimates that beginning retained earnings as of July 1, 2001 will be adjusted by approximately $23 million, related to compensation expense from periods prior to fiscal 2002. Further the

Company stated that because the subcommittee's work is ongoing, these estimates are subject to change.

21.     On September 13, 2002, Aspen filed with the SEC its Annual Report on Form 10-K for the period ending June 30, 2002.

22.     On September 13, 2003, Aspen filed with the SEC its Annual Report on Form 10-K for the period ending June 30, 2003.  In connection with such report, the Company submitted to the Securities and Exchange Commission the certifications of the principal executive officer and the principal financial officer of the Company as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.  Defendant Kane signed the certifications for the 2003 Form 10-K.

23.     On August 4, 2004, Aspen reported its financial results for its fiscal 2004 fourth quarter and fiscal year ended June 30, 2004.  The press release reported:

> Total revenues for the fourth quarter totaled $87.6 million, with software license revenues growing by thirteen percent to $43.5 million and services revenues totaling $44.0 million. Management had previously estimated that total revenues for the fiscal fourth quarter would be in the range of $81 to $83 million and that software license revenues would be in the range of $37 to $39 million. On a Generally Accepted Accounting Principles (GAAP) basis, the company reported a fourth quarter net loss of $41.4 million, or $1.00 per diluted share, which includes one-time charges of $42.8 million. On a pro forma (non-GAAP) basis, excluding these charges, amortization of intangibles, and the preferred stock dividend and discount accretion, the company reported fiscal 2004 fourth quarter net income of $6.6 million, or $0.08 per diluted share.
>
> The company initiated several actions in the fourth quarter that are expected to lower its quarterly expense run rate to approximately $69 million for the quarter ending September 30, 2004. These actions include the redeployment and reduction of personnel, scaling back investments in certain products, and eliminating certain lease obligations. The company expects to direct a portion of these savings toward additional sales and marketing resources that will be focused on its newer products. Management believes its lower expense base and sharpened focus will position the company to achieve double-digit operating margins for fiscal 2005.

The fundamentals of our business continue to remain solid. We delivered our fifth straight quarter of software license growth and, for the first time since June 1998, generated pro forma (non-GAAP) operating margins for the quarter in the double-digits," said David McQuillin, President and CEO of AspenTech. Our sales were balanced by both industry and product mix, as we experienced strength from each of the chemicals, petroleum, and oil & gas markets. Additionally, our manufacturing/supply chain product line had its strongest performance in the past two years.

With the potential approval of the Federal Trade Commission (FTC) settlement, we would remove a major external issue that has distracted us from focusing on our business over the past two years. Our attention has now turned to building on our momentum and increasing our operating margins for fiscal 2005. We indicated at the beginning of this year that we would continue to focus our efforts on bringing all of our products together to provide an integrated solution for the Enterprise Operations Management market. The execution of this integration strategy has enabled us to streamline many of our internal processes to drive costs out of the business, as well as curtail our investment in certain products. These changes will enable us to increase our productivity and efficiency, while driving earnings growth in fiscal 2005.

During the fourth quarter, the company signed significant software license transactions with Shell Oil, Procter & Gamble, Dupont, Nova Chemicals, INVISTA, Sasol, Jacobs Engineering and BASF.

Fiscal 2004 Results

Total revenues for the fiscal year ending June 30, 2004 were $325.7 million, with software license revenues growing by approximately nine percent year-over-year to $152.3 million and services revenue totaling $173.4 million. On a GAAP basis, the company reported a net loss of $35.0 million, or $0.86 per diluted share, as compared to a net loss of $170.0 million, or ($4.42) per diluted share, for fiscal 2003. On a pro forma (non-GAAP) basis, the company reported fiscal 2004 net income of $24.8 million, or $0.31 per diluted share.

During fiscal 2004 we increased our pro forma (non-GAAP) operating income to $27.0 million from $2.5 million in fiscal 2003, reduced our debt by over $100 million, and generated $41 million in cash flow from operations," said Charles Kane, Sr. VP & CFO of AspenTech. "This improvement has been the result of software license revenue growth of nine percent, the reduction of total recurring expenses by more than $21 million, and lowering our DSOs for billed receivables in the fourth quarter to 54 days, a 31 day year-over-year improvement. We are extremely pleased with this performance and anticipate that over the next twelve months we will generate significantly higher operating margins and have a debt-free balance sheet by the end of fiscal 2005.

I am proud of the dramatic improvements we have made in the financial performance of the company for fiscal 2004," McQuillin said. "As we approach AspenWorld, the process industry conference we host every two years, we are excited about our opportunity to showcase how our new, integrated solutions can help customers improve their business processes and capture significant economic value.

FTC Settlement

On July 15, 2004, the company announced that Federal Trade Commission (FTC) commissioners had accepted a Proposed Consent Decree for public comment to settle proceedings regarding its acquisition of Hyprotech. Under the terms of the agreement, AspenTech would agree to sell rights to the Hyprotech product line together with its operator training business to an FTC-approved buyer, but would otherwise retain
the rights to continue selling and developing all of the engineering software products it acquired from Hyprotech, excluding the AXSYS product line. Additionally, AspenTech sold its AXSYS product line to Bentley Systems on July 21, 2004.

The revenue impact from the sale of the operator training business and AXSYS product line is expected to be approximately $20 million, of which approximately $2 million is related to software license revenue. The fiscal 2004 operating income contribution from these businesses was approximately $1.5 million.

Business Outlook

For fiscal 2005, the company anticipates that it will generate pro forma (non-GAAP) earnings per share between $0.31 and $0.40 and that it will deliver double-digit operating margins for the full fiscal year. Due to the sale of its operator training business, which consists primarily of implementation services, the company believes that software license revenues will represent a higher percentage of its total revenues in fiscal 2005.

24.      On September 13, 2004, Aspen filed with the SEC its Annual Report on Form 10-K for the period ending June 30, 2004.  In connection with such report, the Company submitted to the Securities and Exchange Commission the certifications of the principal executive officer and the principal financial officer of the Company as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.  Defendant Kane signed the certifications for the 2004 Form 10-K.

25.     On October 28, 2004 Aspen issued a proxy Statement on Form 14A.   In this

Proxy Statement the Company stated that directors received options of the company as follows:

> As part of the December 2003 review of director compensation policies, our nominating and corporate governance committee reviewed our director option grant program. Upon initial election to the board, we grant each non-employee director an option to purchase 24,000 shares of our common stock at fair market value, *provided* such non-employee director was not, within the twelve months preceding his or her election as a director, our officer or employee or an officer or employee of our subsidiaries. This option vests quarterly over a three-year period beginning on the last day of the calendar quarter following the grant date. Beginning with the first annual meeting following a non-employee director's election to the board and at the end of each quarter thereafter, we grant each non-employee director an option to purchase 3,000 shares of common stock. Each option is fully exercisable at the time of grant and has exercise price equal to the fair market value of the common stock at the time of grant. Options granted to non-employee directors have a term of 10 years.

26.     The following table sets forth information regarding the options we granted to

the named executive officers during the fiscal year ended June 30, 2004:

|  |  |
|---|---|
| David L. McQuillin | 1,516,609 |
| Lawrence B. Evans | 24,000 |
|  | 3,000 |
|  | 3,000 |
|  | 3,000 |
| C. Steven Pringle | 245,008 |
| Charles F. Kane | 150,000 |
|  | 189,216 |
| Stephen J. Doyle | 255,053 |

27.     On October 27, 2004, Aspen announced that its Audit Committee has undertaken

a detailed review of the accounting for certain software license and service agreement

transactions entered into with certain alliance partners and other customers during fiscal years

2000-2002.  The audit committee identified five transactions entered into during our fiscal years

ended June 30, 2000 and June 30, 2001 that it determined were accounted for improperly. The

smallest of these transactions involved recorded revenue of approximately $800,000 and the largest involved approximately $4.3 million of recorded revenue. The audit committee further concluded that, as a result of these transactions, reported revenue for our fiscal years ended June 30, 2000 and June 30, 2001 was overstated and that reported revenue for fiscal years ended June 30, 2002, June 30, 2003 and June 30, 2004 was understated. Therefore, revenue and earnings recorded in our financial statements for fiscal years ended June 30, 2000 through June 30, 2004 was restated.

28.     On September 13, 2005, Aspen reported financial results for its fiscal 2005 fourth quarter and fiscal year ended June 30, 2005. The press release stated:

> Total revenues for the fourth quarter totaled $70.4 million, with software license revenues of $36.1 million and services revenues totaling $34.3 million, compared to the Company's total revenue guidance of $66 to $68 million. On a Generally Accepted Accounting Principles (GAAP) basis, the Company reported a fourth quarter net loss applicable to common stockholders of $29.8 million, or $0.69 per share. Included in the GAAP loss is a tax provision of $3.6 million. Excluding this tax provision and other items in the non-GAAP reconciliation table, the Company reported non-GAAP earnings of $0.00 per share, compared to non-GAAP earnings per share guidance of $0.00 to $0.02.

> "We were pleased with the progress the Company made in the quarter, which was highlighted by revenues exceeding our expectations," said Mark Fusco, President and CEO of AspenTech. "We are delivering against many of the operating initiatives we outlined for investors earlier this year. In just two quarters, we have improved our services revenue and profitability, eliminated our convertible debt, streamlined the organization for better efficiency, positioned the Company for improved profitability in the future with a lower cost structure, and advanced our aspenONE solutions strategy.

> "While our work to improve our business performance has just begun, we are entering Fiscal 2006 with an improved financial position and our new organizational structure should enable us to generate higher levels of profitability and cash flow. We recently closed important aspenONE transactions with two of our largest customers in the chemical and petroleum industries. These long-term agreements are a validation of our aspenONE vision and our customers' willingness to make significant IT investments that help them address their strategic operating initiatives. We hope to leverage these relationships to drive further aspenONE adoption within these key vertical markets.

**Fourth Quarter Highlights**

- AspenTech significantly strengthened its financial position, eliminating $56.7 million of convertible debt and ending the quarter with $68.1 million in cash and $1.4 million of debt.

- Services gross margins increased sequentially by approximately 150 basis points to 43.5%. This improvement was primarily the result of a lower cost base and improved utilization in the professional services organization.

- Signed large fourth quarter software license transactions with Braskem, Polimeri Europa, Technip, Reliance Industries and SINOPEC.

- The chemicals industry represented the highest percentage of the Company's revenue, while the petroleum, and oil & gas industries also made a solid contribution.

- Closed four transactions of $1 million or greater in the quarter.

- Closed its first large scale deal for aspenONE Inventory Management and Operations Scheduling for the Petroleum industry with one of the industry's "super majors". This solution will enable petroleum companies to manage the operational risk and financial exposure that result from lack of visibility into current and projected inventories. AspenTech will work with this customer to incrementally roll out the solution on a global basis.

- Signed a large scale agreement with Lyondell Chemical to roll out a new integrated scheduling solution for the ethylene market. aspenONE for Ethylene Scheduling will enable Lyondell to bring together data and systems to make faster, more profitable scheduling decisions in the plant. The Company believes this project will allow it to target other ethylene plants around the world that could also benefit from aspenONE for Ethylene Scheduling.

Charles Kane, Senior Vice President & CFO of AspenTech said, We were pleased with the Company's revenue performance and the higher level of services profitability in the quarter. While our expense run rate was higher than we would have liked in the fourth quarter, we exited Q4 on track to achieve the organizational efficiencies that we communicated earlier this year. We believe these initiatives will result in a considerably lower expense run rate for the first quarter of fiscal 2006.

29.     On September 13, 2005, Aspen filed with the SEC its Annual Report on Form 10-K for the period ending June 30, 2005. In connection with such report, the Company submitted

to the Securities and Exchange Commission the certifications of the principal executive officer and the principal financial officer of the Company as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.  Defendants Fusco and Kane signed the certifications for the 2005 Form 10-K.

     30.     On October 28, 2005, Aspen issued a proxy Statement on Form 14A.  In this Proxy Statement the Company stated that directors received options of the company as follows:

> Upon initial election to the board, we grant each non-employee director an option to purchase 24,000 shares of our common stock at fair market value of the common stock on the date of grant, *provided* such non-employee director was not, within the twelve months preceding his or her election as a director, an officer or employee of our company or any of our subsidiaries. This option vests quarterly over a three-year period beginning on the last day of the calendar quarter following the grant date. Beginning with the first annual meeting following a non-employee director's election to the board and on a quarterly basis thereafter, we grant each non-employee director an option to purchase 3,000 shares of common stock. Each option is fully exercisable at the time of grant and has an exercise price equal to the fair market value of the common stock at the time of grant. Options granted to non-employee directors have a term of 10 years.

     31.     The following table sets forth information regarding the options granted to the named executive officers during the fiscal year ended June 30, 2005

| | |
|---|---|
| Mark E. Fusco | 1,100,000 |
| David L. McQuillin | 275,000 |
| Charles F. Kane | 100,000 |
| Stephen J. Doyle | 60,000 |
| Manolis E. Kotzabasakis | 60,000 |
| C. Steven Pringle | 80,000 |

     32.     On February 7, 2006, Aspen announced its financial results for its fiscal 2006 second quarter, ended December 31, 2005.  The press release stated:

> For the quarter ended December 31, 2005, AspenTech reported total revenue of $76.4 million, an increase of 7% from the prior year period.  Strong top line results were driven by license revenue of $41.7 million, an increase of 13% from the prior year period.  Services revenue was $34.7 million, a 1% decrease from the $34.9 million in the prior year.  Excluding services revenue of $1.0 million

from the operator training business that was sold in December 2004, services revenue would have been $33.9 million on a non-GAAP basis in the prior year period, yielding an increase of 2% on a year-over-year basis.

Mark Fusco, President and CEO of AspenTech, stated, "In 2005, AspenTech delivered on each of the strategic objectives presented when I took over as CEO. These accomplishments were the result of the hard work of our employees and the loyalty of our blue chip customer base." Fusco added, "After re-aligning our cost and organizational structure, we successfully returned the Company to top-line growth in all parts of our business, including our best performance to date with our aspenONE ™ solutions suite. Our end markets remain strong, and our unique suite of integrated aspenONE solutions, industry leading domain expertise and solid financial base position us well to capitalize on the growing demand in our core vertical markets to optimize plant operations."

For the quarter ended December 31, 2005, AspenTech's income from operations and net income applicable to common shareholders, determined in accordance with generally accepted accounting principles (GAAP), were $8.9 million and $4.3 million, respectively. This represents an increase from a GAAP loss from operations of ($4.7) million and net loss applicable to common shareholders of ($6.7) million in the same period last year. GAAP net income per share applicable to common shareholders on a diluted basis was $0.08 for the quarter ended December 31, 2005, compared with a net loss per share applicable to common shareholders of ($0.16) in the same period last year.

For the quarter ended December 31, 2005, pro forma income from operations, which excludes items covered in the attached non-GAAP reconciliation table, was $13.3 million or an operating margin of 17%. For the quarter ended December 31, 2005, pro forma net income came in at $12.5 million, the highest level since the Company went public in the fiscal year 1995, leading to pro forma earnings per share of $0.14, an increase of 250% compared to the prior year period.

A reconciliation of GAAP to pro forma results has been provided in the financial statement tables included in the press release. An explanation of these measures is also included below under the heading "Non-GAAP Financial Measures."

Charles Kane, CFO of AspenTech, stated, "The December quarter was evidence of the operating leverage potential in AspenTech's business model. For the first time, we saw the benefit of our streamlined cost structure combined with a strong top line performance." Kane added, "At the mid-point of the fiscal year, we are pleased with the operating and financial performance of the business, with all key operating metrics improving on a year-over-year basis, and continued strengthening of our balance sheet and cash flow.

33.      On February 9, 2006, Aspen filed with the SEC its Annual Report on Form 10-Q

for the period ending December 31, 2005.   The Form 10-Q reiterated the financial results

announced on February 7, 2006.   In connection with such report, the Company submitted to the

Securities and Exchange Commission the certifications of the principal executive officer and the

principal financial officer of the Company as required pursuant to 18 U.S.C. 1350, as adopted

pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.   Defendants Fusco and Kane and

Fusco signed the certifications for the Form 10-Q.

34.      On May 9, 2006, Aspen announced its financial results for its fiscal 2006 third

quarter, ended March 31, 2006.   The press release stated:

> For the quarter ended March 31, 2006, AspenTech reported total revenue of $77.1 million, an increase of 20% from the prior year period.   Strong top line results were driven by license revenue of $41.7 million, an increase of 34% from the prior year period.   Services revenue was $35.4 million, an increase of 7% from the prior year period.
>
> Mark Fusco, President and CEO of AspenTech, stated, "We are extremely pleased with our third quarter results, which were strong across all key income statement, balance sheet and cash flow metrics.   We continue to make progress toward our goal of returning AspenTech to a growth company that is able to deliver significant profitability and consistent financial results."   Fusco added, "The momentum in our business is being driven by strong fundamentals in our end user markets, our market leadership position and growing market acceptance of our unique, integrated aspenONE solutions."
>
> For the quarter ended March 31, 2006, AspenTech's income from operations and net income applicable to common shareholders, determined in accordance with generally accepted accounting principles (GAAP), were $9.3 million and $3.2 million, respectively.   This represents an increase from a GAAP loss from operations of ($9.4) million and net loss applicable to common shareholders of ($13.7) million in the same period last year.   GAAP net income per share applicable to common shareholders on a diluted basis was $0.06 for the quarter ended March 31, 2006, compared with a net loss per share applicable to common shareholders of ($0.32) in the same period last year.
>
> For the quarter ended March 31, 2006, non-GAAP net income, which excludes items covered in the attached non-GAAP reconciliation table, was $10.8 million,

resulting in non-GAAP earnings per share of $0.12, compared to management's guidance given in February 2006 of $0.06 to $0.08 per share.

A reconciliation of GAAP to non-GAAP results has been provided in the financial statement tables included with this press release. An explanation of these measures is included below under the heading "Non-GAAP Financial Measures." The company is reporting these non-GAAP financial results for the fiscal 2006 third quarter solely for the purpose of providing consistency with previously issued guidance, which was presented on a non-GAAP basis. Beginning with the fiscal 2006 fourth quarter, AspenTech will provide guidance only on a GAAP basis.

Charles Kane, CFO of AspenTech, stated, "In addition to rapid revenue growth and expanding profitability, AspenTech also continued to strengthen the balance sheet and improve cash flow during the March quarter. The scalability of our business model is being demonstrated with the return to improved top line growth."

35.    On May 10, 2006, Aspen filed with the SEC its Annual Report on Form 10 Q for the period ending March 31, 2006. The Form 10 Q reiterated the financial results announced on May 9, 2006. In connection with such report, the Company submitted to the Securities and Exchange Commission the certifications of the principal executive officer and the principal financial officer of the Company as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Defendants Fusco and Kane and Fusco signed the certifications for the Form 10Q.

36.    On July 7, 2006, Aspen reported that Lawrence Evans, its former Chairman of the Board and Chief Executive Officer, David McQuillin, its former Chief Executive Officer, and Lisa Zappala, its former Chief Financial Officer, have each received a "Wells Notice" letter from the staff of the United States Securities and Exchange Commission of possible civil enforcement action believed to be regarding our originally filed financial statements for fiscal years 2000-2004, which were restated in March 2005. The Company stated that the letters concern matters associated with historical financial statements which were superseded by its restated fiscal year

2000-2004 financial statements that we filed in March 2005 following a review initiated by the audit committee of our board of directors.

37.    August 10, 2006--Aspen announced that the company would disclose financial results for its fourth quarter and fiscal year, ended June 30, 2006, after the U.S. financial markets close on Wednesday, September 6, 2006.

38.    The August 10, 2006 press release was materially false and misleading because defendants knew but failed to disclose at this time that a subcommittee of independent directors was appointed to review the Company's accounting treatment for stock option grants for prior years.

39.    On September 6, 2006, Aspen announce selected preliminary financial results for its fiscal 2006 fourth quarter and fiscal year ended June 30, 2006.  The press release stated:

> For the quarter ended June 30, 2006, AspenTech reported total revenue of $79.2 million, an increase of over 10% from the prior year period.  Top line results were driven by license revenue of $44.4 million, which increased over 20% from the prior year period.  Services revenue was even with the prior year period at $34.8 million.

> For the full year fiscal 2006, AspenTech reported total revenue of $293.3 million, an increase of 9% from the prior year.  Within total revenue, license revenue increased 18% to $152.7 million and services revenue was even with the prior year at $140.6 million.

> AspenTech had cash and cash equivalents of $86.3 million at June 30, 2006, an increase of 23% compared to $70.1 million at the end of the prior quarter, and the company remains essentially debt-free. The increase in cash was primarily the result of strong cash flow from operations during the quarter. As of June 30, 2006, deferred revenue was $67.3 million, an increase of over 10% on a year-over-year basis.

> Mark Fusco, President and CEO of AspenTech, stated, "Our fourth quarter results were highlighted by another very strong license revenue performance and increase in our cash balance." Fusco added, "I am extremely proud that AspenTech achieved each of our major initiatives entering the fiscal year — improving our key profitability margins, returning to significant cash flow generation, restoring

top line growth, and having success in bringing our aspenONE solutions to our key target vertical markets."

Fusco also stated, "Our end markets remain strong and demand for our unique, integrated aspenONE solutions is enhancing our revenue growth. We believe AspenTech is the only vendor able to offer a broad, integrated suite of applications to solve the plant optimization challenges facing the process industries. With a large, blue chip customer base in the process industries, strengthened financial position, improved execution and growing traction with our aspenONE solutions, we are optimistic about our outlook for fiscal 2007."

The company also announced that, in connection with the preparation of financial statements for the fiscal year-ended June 30, 2006, a subcommittee of independent directors was appointed to review the company's accounting treatment for stock option grants for prior years. That review is still ongoing. The subcommittee has concluded that errors were made in the accounting for certain historical stock options granted during and prior to fiscal 2004, and previously issued financial statements will require restatement as a result of these errors. Accordingly, previously issued financial statements and the related reports of our independent registered public accounting firm should not be relied upon. The subcommittee currently estimates that additional compensation and related payroll tax expense of approximately $12 million, $10 million, $7 million, $1 million and $1 million will be required to be recorded in fiscal years 2002, 2003, 2004, 2005 and the first three quarters of fiscal 2006, respectively. In addition, the subcommittee currently estimates that beginning retained earnings as of July 1, 2001 will be adjusted by approximately $23 million, related to compensation expense from periods prior to fiscal 2002. Because the subcommittee's work is ongoing, these estimates are subject to change. The subcommittee's review indicates that these compensation expense impacts are primarily the result of errors in the determination of the measurement date related to grants of options allocated among a pool of employees when the specific number of options to be awarded to specific employees had not been finalized.

40.     On September 6, 2006 at the very bottom of the press release the Company also announced:

The company expects that the restated financial statements will also reflect the correction of certain previously identified errors, which were not previously recorded because the company believed they were not material, as well as certain miscellaneous errors identified during the fiscal 2006 financial closing process. Such corrections will impact both the previously issued annual periods from 2003 to 2005 and the quarterly periods for 2006. These adjustments are expected to increase net income by approximately $3 million for the first three quarters of

fiscal 2006, with a corresponding decrease in net income for fiscal years 2003, 2004 and 2005 of an equal amount in the aggregate

41.     Following the news issued by Aspen on September 6, 2006, the price of Aspen shares crashed, falling by 13%, or $1.21 on the following trading day. The decline in Aspen's stock price is a direct result of the nature and extent of defendants' false statements being revealed to investors and the market.  The crash of the Company's stock price caused significant harm to Plaintiff and Aspen's other public shareholders.

42.     The press releases and SEC filing detailed above were materially false and misleading because the Company failed to properly expense non-cash stock-based compensation which should have been recorded with respect to stock option grants and, and that the amount of such additional expenses is material.  As a result of the Company manipulating the actual dates of measurement for stock options Aspen was force to report on September 6, 2006 that "errors" were made in the accounting for certain historical stock options granted during and prior to fiscal 2004, and previously issued financial statements will require restatement as a result of these errors.  Accordingly, previously issued financial statements and the related reports of our independent registered public accounting firm should not be relied upon.  The Company stated that currently estimates that additional compensation and related payroll tax expense of approximately $12 million, $10 million, $7 million, $1 million and $1 million will be required to be recorded in fiscal years 2002, 2003, 2004, 2005 and the first three quarters of fiscal 2006, respectively.  In addition, the Company stated that it currently estimates that beginning retained earnings as of July 1, 2001 will be adjusted by approximately $23 million, related to compensation expense from periods prior to fiscal 2002.

43.     Defendants engaged in improper practices in order to bolster the Company's stock price.  Defendants directly participated in an accounting fraud which materially overstated the Company's financial results in violation of Generally Accepted Accounting Principles ("GAAP"). Defendants materially overstated Aspen's financial results by improperly recording the actual dates of measurement for past stock options grants.  As a result of the Company manipulating the actual dates of measurement for stock options Aspen is forced to restate its previously issued financial statements for the fiscal years 2002, 2003, 2004, 2005 and the first three quarters of 2006.

44.     In knowing or reckless disregard of the truth, defendants issued and/or participated in the issuance of materially false and misleading statements and financial information to the investing public, as particularized above.  These representations were materially false and misleading when made for the reasons set forth herein.

45.     In addition, the defendants not only falsely and materially overstated the Company's earnings figures but failed to file financial statements with the SEC which conformed to the requirements of GAAP, such that the financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 CFR 210.4-01(a)(1).

46.     As a result of its accounting improprieties, Aspen's reported financial results also violated at least the following provisions of GAAP for which each defendant is necessarily responsible:

The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant to a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶ ¶ 58-59);

The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions, was violated (FASB Statement of Concepts No. 2, ¶ 79).

The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶ ¶ 95, 97).

47.      Defendants' false representations and material omissions were made with <u>scienter</u> in that: defendants knew or recklessly disregarded that the Class Period SEC Filings and the Class Period press releases were materially false and misleading as described above; knew or were reckless in not knowing that the false financial results would be issued or disseminated to the investing public; and knowingly and substantially participated in the preparation and/or issuance or dissemination of such statements or documents.

**COUNT 1**
**For Violations of Sections 10(b) and 20(a)**
**of the Exchange Act and Rule 10b-5**

48.      Plaintiff incorporates by reference and realleges each of the foregoing paragraphs.

49.      During the Class Period, defendants, individually and in concert, engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon plaintiff and other members of the Class, and made various untrue and deceptive statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and other Class members. The purpose and effect of this scheme was to induce plaintiff and the Class to purchase Aspen common stock at artificially inflated prices.

50.     During the Class Period, defendants, pursuant to their plan, scheme and unlawful course of conduct, knowingly and/or recklessly issued, or caused to be issued statements to the investing public as described above, including the Class Period press releases and the Class Period SEC Filings.

51.     Defendants knew and/or recklessly disregarded the falsity of the foregoing statements.   As senior officers and/or directors of the Company, involved in its business and operations, the Individual Defendants had access to the non-public information detailed above, by virtue of their receipt of periodic internal reports detailing actual sales, advertising revenues and other financial information.

52.     Throughout the Class Period, Aspen acted through the Individual Defendants, whom it portrayed and represented to the press and public as its valid representatives.  The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to Aspen which is primarily responsible for the securities law violations of the Individual Defendants while acting in their official capacities as Company representatives, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of *respondent superior.*

53.     Each of the defendants knew or recklessly disregarded the fact that the above acts and practices, misleading statements, and omissions would adversely affect the integrity of the market in Aspen's common stock.  Had the adverse facts defendants concealed been properly disclosed, Aspen's stock would not have sold at the artificially inflated prices it did during the Class Period.

54.     The value of Aspen common stock declined materially upon public disclosure of the truth concerning the Company's financial circumstances, financial circumstances which had been

misrepresented or concealed, as alleged in this complaint.  Plaintiff and other members of the Class have suffered substantial damages as a result of the wrongs alleged herein.

55.      By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.      By reason of their status as officers and/or members of management and as directors of Aspen the Individual Defendants were "controlling persons" of Aspen within the meaning of Section 20 of the Exchange Act and had the power and influence to cause Aspen to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or in directly, control the conduct of Aspen's business, the information contained in its filings with the SEC and public statements about its business.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues.

**WHEREFORE,** plaintiff on his own behalf and on behalf of the Class prays for judgment as follows:

A.      Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff to be a proper class representative and his counsel lead counsel;

B.      Awarding plaintiff and the Class compensatory damages, together with appropriate prejudgment interest at the maximum rate allowable by law;

C.      Awarding plaintiff and the Class their costs and expenses for this litigation including reasonable attorneys' fees and other disbursements; and

D.      Granting such other and further relief as this Court deems to be just and proper.

Dated:  September 8, 2006

_____

Leslie R. Stern, Esq. (BBO 631201)
**BERMAN DEVALERIO PEASE**
**TABACCO BURT & PUCILLO**
One Liberty Square, 8th Floor
Boston, MA 02109
Tel. (617) 542-8300
Fax (617) 542-1194
*lstern@bermanesq.com*

*AS LOCAL COUNSEL FOR:*

**ABBEY SPANIER RODD ABRAMS &**
**PARADIS, LLP**
Arthur N. Abbey
Nancy Kaboolian (NK 6346)
212 East 39th Street
New York, NY 10016
Tel. (212) 889-3700
Fax (212) 684-5191
          -and-
**ROY  JACOBS & ASSOCIATES**
Roy L.  Jacobs
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 867-1156
Facsimile:  (212) 504-8343

*ATTORNEYS FOR PLAINTIFF*

*G:\Securities\Aspen\Pleading\9-8-06_Aspen Tech Complaint.DOC*

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I        Laurence D. Paskowitz , declare as follows:

1.    I have reviewed a copy of the complaint filed in this action.

2.    I did not purchase the security that is the subject of this action [Aspen Technology Inc. (AZPN)] at the direction of counsel, Abbey Spanier Rodd Abrams & Paradis, LLP, or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase/Sale) | Quantity | Trade Date | Price Per Share/ Security |
|---|---|---|---|---|
| Common Stock | Purchase | 800 | 9/1/06 | $12.0056 |
| Common Stock | sell | 800 | 9/7/06 | $10.8244 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*List additional transactions on a separate sheet of paper, if necessary.  If the securities were purchased by joint owners, please provide the above information for the co-owner.

5.    I have not served as or sought to serve as a representative party on behalf of a class during the last three years, except as stated herein:

        In re Motive 05 CV 923 (W.D. Tex)
        St. Jude Medical Inc 06 CV1379 (D. Minn)

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    9/7/06           Signed: _____